**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**APPALACHIAN POWER COMPANY,**

***Plaintiff,***

**v.** **CIVIL ACTION: 2:26-cv-00742**

**INTER MOUNTAIN CABLE, Inc.,**
**and MIKROTEC CABLE, LLC,**

***Defendants.***

## COMPLAINT

Appalachian Power Company ("APCo"), by counsel, hereby files its Complaint against the Defendants, Inter Mountain Cable, Inc. and Mikrotec Cable, LLC and avers as follows:

## PARTIES, JURISDICTION, AND VENUE

1. APCo is a Virginia corporation, with its principal place of business in Ohio, that is licensed to conduct business in West Virginia.

2. Inter Mountain Cable, Inc. ("Inter Mountain"), is a Kentucky corporation licensed to do business in West Virginia.

3. Mikrotec Cable, LLC ("Mikrotec") is a Kentucky corporation licensed to do business in West Virginia.

4. Inter Mountain and Mikrotec are both wholly owned subsidiaries of the same parent corporation, Gearheart Communications, Inc.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is appropriate in this Court because the facts and circumstances which lead to the breach of contract occurred within this district.

## BREACH OF CONTRACT

7. Inter Mountain is a party to a Joint Use agreement with APCo dated January 1, 1988 ("Joint Use Agreement").

8. In 1994, the Joint Use Agreement was assigned to Tel-Com, Incorporated which was a Kentucky Corporation owned by the same principals who own Inter Mountain.

9. In 1995, Tel-Com was renamed to Inter Mountain and thereby, Inter Mountain became bound, again, by the terms of the Joint Use Agreement.

10. In exchange for the placement of Inter Mountain's cables on poles owned by APCo, Inter Mountain, as the Operator, agreed, in relevant part, in Paragraph 12 of the Joint Use Agreement, to indemnify, hold harmless and defend APCo, as the Owner, from and against "any and all loss, damage, cost or expense which Owner may suffer . . . by reason of bodily injury, including death, to any person, . . . arising out of or in any manner connected with the attachment, operation, and maintenance of the facilities of Operator on the poles of Owner under this Agreement, whether or not due in whole or in part to any act, omission or negligence of Owner or any of its representatives or employees."

11. Mikrotec is a party to a Pole Attachment License Agreement with APCo dated June 1, 2006 ("Pole Agreement").

12. Like the Joint Use Agreement with Inter Mountain, the Pole Agreement in which Mikrotec is a party, includes, in relevant part, an obligation that Mikrotec, " . . . for itself and its contractors and subcontractors, to . . . indemnify, hold harmless, and defend Indemnities [APCo]

from and against any and all losses, liabilities, costs, expenses, suits, actions, claims and all other obligations and proceedings, whatsoever, including, without limitation, all judgments rendered against, and all fines and penalties imposed upon indemnitees, and any reasonable attorneys' fees and any other costs of litigation . . . arising, directly or indirectly, . . . out of injuries to persons, including disease or death, . . . in any other way attributable to or arising either directly or indirectly out of, the attachment, installation, operation, presence, use, maintenance, or removal of [Mikrotec's] facilities."

13. Mikrotec's obligation to indemnify does not apply to liabilities arising from APCo's reckless or willful misconduct, which is essentially an understanding between the Parties that Mikrotec does not have to indemnify for punitive liability damages.

14. In addition to the defense and indemnity provisions of both the Joint Use Agreement and the Pole Agreement (collectively referred to as "Agreements"), the Agreements placed the responsibility on Inter Mountain and Mikrotec to ensure proper precautions were taken with respect to work on APCo's poles.

15. In addition to the Agreements, Inter Mountain and Mikrotec were obligated to comply with APCo's Pole Attachment Policy ("Pole Attachment Policy"), all of which imposed upon the Defendants certain obligations, including but not limited to, the obligation to comply with applicable OSHA regulations. The Pole Attachment Policy also states that "[p]rior to the commencement of any Attachment, the attaching party, its agents, and contractors shall inspect the work area on or near [APCo's] poles specifically to ascertain the actual and potential existence and extent of any hazardous or dangerous conditions."

16. The Pole Attachment Policy also states that Inter Mountain and Mikrotek "… assume responsibility for determining, and have a duty to determine the condition of all poles to be climbed by its employees, agents, contractors or employees of contractors."

17. Both Inter Mountain and Mikrotec agreed in their respective agreements to protect their employees and the public against injury.

18. Both Inter Mountain and Mikrotec agreed in their respective agreements to cause their employees to follow applicable safety standards and proper construction practices.

19. On June 5, 2026, Patrick Teeters, an employee of Inter Mountain, was injured while performing work for Inter Mountain when a pole, owned by APCo in or around Matewan, West Virginia, tipped, causing him to fall which resulted in personal injuries (the "Incident").

20. Per Mr. Teeters's testimony, he was tasked with splicing cable on the pole at issue for his employer on the date of the alleged incident.

21. In September 2025, Mr. Teeters filed suit against APCo for damages he alleges to have incurred as result of the Incident. (**Exhibit A**.)

22. Mr. Teeters is seeking damages for his injuries, past and future medical care, past and future lost earnings, lost household services, pain and suffering, and punitive damages.

23. On February 19, 2026, APCo tendered its request for a defense and indemnity to Inter Mountain regarding the claims of Mr. Teeters. (**Exhibit B**.)

24. APCo sent a follow-up request on April 17, 2026, to Inter Mountain via its counsel. (**Exhibit C**.)

25. On May 11, 2026, Inter Mountain's insurance carrier acknowledged the request but declined to accept the defense and indemnity. (**Exhibit D**.)

26. In the carrier's response, it referred to the Mikrotec contract as being the applicable contract for purposes of the claim.

27. A third request for defense and indemnity was provided to Gearheart Communications, Inter Mountain and Mikrotec on July 30, 2026. (**Exhibit E**.)

28. In its third request, APCo explained to Defendants that the evidence in the case brought by Mr. Teeters demonstrated that Mr. Teeters was either not properly trained or that he failed to follow training with respect to assessing the safety of working on a utility pole.

29. Moreover, APCo explained that Mr. Teeters' own admissions at deposition demonstrated that he failed to properly inspect the subject utility pole per the applicable safety regulations.

30. Given the facts and circumstances of Mr. Teeters' claims, APCo asserted that the Agreements and APCo's Pole Attachment Policy placed the duty on Defendants for Mr. Teeters' alleged injuries.

31. APCo has not received a response to its most recent request.

32. Despite these tender requests, Defendants have not accepted the defense of APCo and have breached their obligation to indemnify, defend and hold APCo harmless in Mr. Teeters' case.

33. Defendants' refusal to accept APCo's request for indemnity and a defense is contrary to the sworn testimony in the underlying civil action filed on behalf of Mr. Teeters.

34. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, it is important to train line crews to evaluate the structural integrity of wood poles. The Defendants' own training document states "[w]hen work is to be performed on a wood pole, it is important to determine the condition of the pole before it is climbed."

35. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, the Defendants have no documents establishing that Mr. Teeters was ever trained regarding the risks associated with climbing a wooden pole prior to determining the condition of the pole.

36. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, the Defendants utilized PowerPoint training documents Bates Numbers IM 0219 and 0228 to train employees as to the risks associated with climbing a pole embedded in soft, wet, or loose soil. The training document specifically states that "Soft, wet, or loose soil may not support any changes of stress on the pole."

37. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness, Defendants do not have any documentation to establish that Mr. Teeters was ever trained on the risks of climbing a pole embedded in soft, wet or loose soil.

38. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, the Defendants utilize PowerPoint training documents to advise employees as to how to perform a "hammer test" on poles to test the structural integrity of poles prior to climbing them.

39. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, the Defendants do not possess any documents showing that Mr. Teeters was ever trained regarding how to perform a hammer test.

40. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, Mr. Teeters did not perform a hammer test prior to climbing the pole at issue.

41. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, the Defendants utilize PowerPoint training documents to train new hires how to apply horizontal force to poles prior to climbing the pole to determine the structural integrity of the poles. Bates Number IM-0232 states "[a]pply a horizontal force to the pole and attempt to rock it back and forth in a direction perpendicular to the line. Caution must be exercised to avoid causing power lines to swing pushing with a pike pole or pulling with a rope."

42. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, the Defendants have no documentation to show that Mr. Teeters was ever trained regarding how to use a pike pole or rope to test the structural integrity of the pole at issue.

43. Pursuant to the sworn testimony of Mr. Teeters on April 24, 2026, and the sworn testimony of Dwayne Nelson on July 21, 2026, as a designated corporate witness on behalf of Inter Mountain, Mr. Teeters did not have access to a pike pole on the day of his accident.

44. Also pursuant to the sworn testimony of Dwayne Nelson, the Defendants possess no documents establishing that Mr. Teeters was ever trained regarding OSHA 1910.268(n)(3)(ii),

which requires employees to apply horizontal force to test the integrity of utility poles prior to climbing the poles.

45. Pursuant to the sworn testimony of Dewayne Nelson, Inter Mountain does not use push or pike poles to test the integrity of utility poles as required by OSHA 1910.268(n)(3)(ii).

46. Pursuant to the sworn testimony of Angela Hall on July 22, 2026, as a designated corporate witness on behalf of Inter Mountain, even though the Defendants' training documents deviate from applicable OSHA regulations and permit employees to use a rope to pull on a pole rather than use a pike or push pole, the Defendants have no evidence to establish that Mr. Teeters used a rope to test the integrity of the pole at issue. Also pursuant to her sworn testimony, the Defendants have no documents to show that Mr. Teeter was ever trained on how to use a rope to test the integrity of a utility pole.

47. Pursuant to the sworn testimony of multiple representatives of Inter Mountain (Teeters, Paul Mounts, Dwayne Mullens), Mr. Teeters had three options to access the lines he was assigned to splice: (1) climb the pole using a ladder; (2) climb the pole using gaffs; or (3) utilize a bucket truck. All persons testifying on the subject on behalf of Inter Mountain have testified Mr. Teeters' accident would not have happened had he utilized a bucket truck. Further, his co-workers, Paul Mounts and Dwayne Mullens, testified under oath on September 2, 2026 and July 21, 2026, and each testified using a bucket truck or gaffs would have been safer than attempting to access the lines with a ladder.

48. Pursuant to OSHA 1926.955(b)(3), portable ladders shall be secured in place to prevent them from becoming dislodged. Pursuant to the sworn testimony of Inter Mountain employees Dwayne Mullens and Dwayne Nelson, there are two ways to secure a ladder to a utility

pole prior to climbing: (1) by utilizing a strap; and (2) by running a lineman's rope up the ladder, around the back of the pole, and down the ladder. According to the sworn testimony of Dwayne Mullens, Dwayne Nelson and Mr. Teeters, Mr. Teeters never received any training regarding how to secure an extension ladder to a utility pole or the requirements of OSHA 1926.955(b)(3),

49. OSHA regulations require employees such as Mr. Teeters who are using extension ladders to access utility poles to insure that the butt of the ladder is not place more than one quarter of the working height for the ladder. Stated otherwise, if the employee has extended a ladder to 20 feet, the butt of the ladder should not be placed more than 5 feet from the base of the pole. This is commonly referred to as the "4:1" rule.

50. Exceeding the 4:1 rule creates the risk of the ladder kicking out and increases the amount of force on the utility pole creating the risk of the pole dislodging.

51. Mr. Teeters placed the butt of his ladder outside of the "4:1" spacing rule applying an excessive and unsafe amount of force to the pole he was climbing.

52. Mr. Teeter failed to perform a hammer test on the pole he was climbing.

53. Mr. Teeters failed to secure his ladder to the pole he was climbing.

54. Mr. Teeter failed to test the structural integrity of the pole he was climbing with a push pole, pike pole or rope.

55. Mr. Teeters failed to properly evaluate the risks of his job site.

56. Mr. Teeters failed to utilize a much safer means of accessing his work area with a bucket truck.

57. Mr. Teeters' accident and resulting injuries were caused by Mr. Teeters' failure to follow mandatory safety rules and regulations, the Defendants' failure to properly train Mr. Teeters on the importance of following these mandatory safety rules and regulations, or a combination of both the failure to follow and the failure to train.

58. As a proximate result of Defendants' refusal to honor the obligations set forth in the Agreements, APCo has and continues to incur defense costs in defending against the claims of Mr. Teeters.

59. As a proximate result of Defendants' refusal to honor the obligations set forth in the Agreement, APCo faces a potential jury verdict in the case brought by Mr. Teeters, which should be paid by Defendants.

60. Defendants' refusal to defend and indemnify APCo is a breach of the Agreements between the parties.

61. As a proximate result of Defendants' breach of the Agreements, APCo has suffered and will continue to suffer damages.

**WHEREFORE**, APCo demands the following relief:

1. That the Court enter judgment in its favor finding that Defendants are required to defend and indemnify APCo for the claims of Mr. Teeters;

2. That the Court enter judgment in APCo's favor for all damages available to APCo as a result of Defendants' breach of the Agreement;

3. That APCo be awarded its reasonable attorneys' fees and expenses with respect to this litigation;

4. That all costs be assessed against Defendants; and

5. That the Court award such other relief as shall appear proper and just.

**Respectfully submitted,**
**Appalachian Power Company,**
**By Counsel.**

*/s/ Brian R. Swiger*
Brian R. Swiger (WVSB #5872)
Rebecca D. Pomeroy (WVSB #8800)
Adam H. Wilson (WVSB #14308)
**BAILEY & GLASSER LLP**
209 Capitol Street
Charleston, WV 25301
T: (304) 345-6555
F: (304) 342-1110
bswiger@baileyglasser.com
bpomeroy@baileyglasser.com
awilson@baileyglasser.com